Courtney L. Baird (SBN 234410)
clbaird@duanemorris.com
Ryan S. Crawford (SBN 363709)
rcrawford@duanemorris.com
**DUANE MORRIS LLP**
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: +1 619 744 2200
Fax: +1 619 744 2201

Michelle N. Khoury (SBN 307229)
mkhoury@duanemorris.com
**DUANE MORRIS LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

Lawrence H. Pockers (*pro hac vice* forthcoming)
lhpockers@duanemorris.com
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA  19103
Telephone: +1 215 979 1000
Fax: +1 215 979 1020

Attorneys for Plaintiff
GOLD STANDARD DIAGNOSTICS, LLC

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| GOLD STANDARD DIAGNOSTICS, LLC, a Delaware limited liability company,<br><br>     Plaintiff,<br><br>  v.<br><br>CLEAR PATH DIAGNOSTICS LLC, a California limited liability company; GERRIT MUELLER, an individual; and IVA MUELLER, an individual,<br><br>     Defendants. | Case No.<br><br>**VERIFIED COMPLAINT FOR:**<br><br>1. **MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1832, *et seq.*)**<br><br>2. **MISAPPROPRIATION OF TRADE SECRETS (Cal. Civ. Code, § 3426, *et seq.*)**<br><br>3. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br><br>4. **BREACH OF THE DUTY OF LOYALTY**<br><br>5. **AIDING AND ABETTING BREACH** |

VERIFIED COMPLAINT

**OF THE DUTY OF LOYALTY**

6. **CONVERSION**

7. **VIOLATION OF UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code, § 17200, *et seq.*)**

**DEMAND FOR JURY TRIAL**

1

Gold Standard Diagnostics, LLC ("Gold Standard"), by its undersigned counsel, files this Verified Complaint against Clear Path Diagnostics LLC ("Clear Path"), Gerrit Mueller ("Mueller"), and Iva Mueller ("Iva Mueller") (collectively, "Defendants") for misappropriation of trade secrets, intentional interference with contractual relations, breach of the duty of loyalty, aiding and abetting breach of the duty of loyalty, conversion, and violation of unfair competition law.

**Summary of the Action**

1.      This action concerns Defendants' scheme to steal Gold Standard's proprietary, confidential, and trade secret information to create a competing medical diagnostics company, Clear Path, which is unlawfully and unfairly competing with Gold Standard.

2.      Gold Standard is a leading provider of medical diagnostic equipment and testing kits. Gold Standard's product portfolio spans multiple technologies, covering Autoimmune, Infectious Disease, Endocrinology, Microbiology, Oncology, and Chemistry.

3.      Because of the nature of its business, Gold Standard must comply with extensive regulations and standards.  These include Federal and Drug Administration ("FDA") regulations governing in vitro diagnostic products, the EU's In Vitro Diagnostic Regulation ("IVDR") (EU Regulation 2017/746), ISO (International Standards Organization) standards, and MDSAP (Medical Device Single Audit Program) requirements.

4.      In order to comply with these extensive regulations and standards, Gold Standard, like any medical diagnostic company, maintains a Quality Management System ("QMS") – *i.e.*, a formalized framework of policies, processes, procedures, and responsibilities that governs every aspect of Gold Standard's operations including product design and development, verification and validation testing, complaint handling and manufacturing controls and documentation.  Gold Standard's QMS took many years to develop and cost millions of dollars.

5.      Gold Standard goes to extraordinary lengths to maintain the secrecy of its proprietary, confidential, and trade secret information, including the information maintained in the QMS.  Access to Gold Standard's QMS is password-protected and limited to authorized personnel.  Gold Standard maintains its confidential information on secure, access-controlled platforms, which require unique user credentials.  Keycard-controlled access secures Gold Standard's facility, and its computers and

2

VERIFIED COMPLAINT

network are encrypted and password-protected.

6. Gold Standard's employees, including Mueller, are required to abide by the comprehensive confidentiality and trade secret, and conflict-of-interest provisions in the Employee Handbook. These provisions expressly prohibit the disclosure, removal, or misuse of confidential information both during and after employment. The Employee Handbook also requires employees to conduct themselves consistent with the Eurofins Group Code of Ethics (the "Code of Ethics"). Mueller signed an acknowledgment confirming he had read and agreed to follow all Employee Handbook provisions, and he completed training on the Code of Ethics.

7. Mueller was employed by Gold Standard for more than 15 years. He started as an intern in 2010 and worked his way up to become Gold Standard's Director of Project Management, a position he held until his resignation on January 30, 2026.

8. As Director of Project Management, Mueller was responsible for the conception, research, development, and commercialization of new diagnostics technologies and products throughout the product life cycle. He was involved, to various degrees, in Gold Standard's research and development projects. In his role, he had access to Gold Standard's QMS, proprietary product development information, formulations, regulatory strategies, customer data, pricing information, and quality system documents.

9. From approximately 2010 to 2019, Mueller was also the primary IT resource for the company with unique access to and information about Gold Standard's information technology architecture and systems.

10. Mueller resigned from Gold Standard on January 30, 2026.

11. Gold Standard has now discovered that Mueller apparently misappropriated Gold Standard's confidential and trade secret information in connection with his establishment of a competing diagnostics company.

12. On February 12, 2026, Mueller and his wife, Iva Mueller, filed Articles of Organization for Clear Path Diagnostics LLC with the California Secretary of State. The very next day, the domain for Clear Path (cpdiag.com) was registered. Within weeks, Clear Path secured an active FDA establishment registration as an initial distributor/importer, with Mueller listed as the

VERIFIED COMPLAINT

official correspondent.

13.     In late March 2026, Gold Standard learned that one of its key suppliers, Bordier Affinity Products SA ("Bordier"), was terminating its long-standing business relationship with Gold Standard.  For more than 10 years, Gold Standard was the exclusive distributor of Bordier's products in the United States and Canada.

14.     Bordier notified Gold Standard that it would "stop the collaboration with Gold Standard" and had "signed an agreement" with "another US distributor."  Bordier refused to fulfill Gold Standard's outstanding purchase orders.

15.     Gold Standard has now discovered that Bordier's new distributor is Clear Path and that Clear Path was created by Mueller and his wife.

16.     Although Gold Standard's investigation is still in its early stages, the company has discovered the following evidence demonstrating Mueller's apparent intentional copying, downloading, retention and, upon information and belief, use of Gold Standard's trade secret, confidential and/or proprietary information:

- Mueller has retained Gold Standard's proprietary, confidential, and trade secret information on a device that is still in his possession;

- In the months leading up to his resignation, Mueller's access to Greenlight Guru, the platform that hosts Gold Standard's QMS, spiked dramatically in a way that cannot be explained by his job responsibilities.  The roughly sixfold increase in Mueller's access to Greenlight Guru coincided with a downturn in the relationship between Gold Standard and Bordier, and occurred outside of normal business hours (*i.e.*, early in the morning and late at night);

- In addition to the QMS, Mueller began accessing Gold Standard's proprietary, confidential and trade secret information on Zoho, Gold Standard's Customer Relationship Management ("CRM") system, in the months and days leading up to his departure.  Starting in October 2025, Mueller searched for and accessed Gold Standard Customer information, including information for customers of Bordier products, once again under circumstances that cannot be explained by his job responsibilities; and

- Mueller was particularly busy on the eve of his departure.  Logs of Mueller's online activity reveal that between 10 p.m. and 11 p.m. on January 29, 2026, Mueller accessed and apparently downloaded trade secret and confidential information belonging to Gold Standard for use in his competing business.

17.     Clear Path is a direct competitor of Gold Standard.  Its website advertises "Trusted Diagnostic Solutions for Parasitology and Mycology"—the same specialties as the Bordier product

4

VERIFIED COMPLAINT

line that Mueller managed at Gold Standard for approximately 10 years. Clear Path's product catalog lists the identical Bordier parasitology and mycology ELISA kits that Gold Standard previously distributed as Bordier's exclusive U.S. reseller.

18.    Gold Standard believes and avers that the evidence it has uncovered in its preliminary investigation is just the tip of the iceberg. Given Mueller's extensive access to Gold Standard's confidential information—including customer lists, R&D data, quality system documents, and proprietary business systems—and his familiarity with Gold Standard's information technology landscape and architecture, there is a significant and imminent risk that Mueller will continue to misappropriate and use Gold Standard's trade secrets.

**Parties**

19.    Gold Standard Diagnostics, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 2795 2nd Street, Suite 300, Davis, California 95618. Gold Standard manufactures and distributes medical diagnostic equipment and testing kits.

20.    Upon information and belief, Defendant Clear Path Diagnostics LLC is a California limited liability company with its principal place of business at 11300 Sanders Drive, Unit 24, Rancho Cordova, California 95742.

21.    Defendant Gerrit Mueller is an individual who, upon information and belief, resides in or around Sacramento County, California.

22.    Defendant Iva Mueller is an individual who, upon information and belief, resides in or around Sacramento County, California.

**Jurisdiction and Venue**

23.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because this Verified Complaint includes claims for Defendants' violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832, *et seq.*, a federal statute. This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

24.    Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b), including because a substantial portion of the events giving rise to the claims in this action occurred in this

VERIFIED COMPLAINT

judicial district.  The events giving rise to Gold Standard's claims primarily took place in and around Gold Standard's headquarters in Davis, California, located in Yolo County, and at Clear Path's headquarters in Rancho Cordova, both within the Eastern District of California.

### Divisional Assignment

25.    Pursuant to Civil L.R. 120(d), this case is properly assigned to the Sacramento Division of this Court because a substantial part of the events giving rise to the claims in this action occurred in Yolo County and Sacramento County.

### Gold Standard's Business

26.    Gold Standard manufactures and distributes medical diagnostic equipment and testing kits.  Gold Standard's product portfolio spans multiple technologies—ELISA, Immunoblot, Chemiluminescence, IFA/IRMA, Liquid Immunoassay, and Multiplex—covering Autoimmune, Infectious Disease, Endocrinology, Microbiology, Oncology, and Chemistry.

27.    Gold Standard invested millions of dollars and many years to develop its regulatory and quality infrastructure—including its quality management system, complaint handling and ticketing systems, and comprehensive business operations with fully staffed sales, technical support, and shipping and receiving departments.  These functions are necessary to support suppliers and customers at scale.  Gold Standard's quality systems must satisfy FDA regulations, ISO 13485:2016, the EU's IVDR, CE marking requirements, and MDSAP, among other regulatory frameworks.  Gold Standard also undergoes periodic audits to maintain its certifications.

28.    Gold Standard maintains its confidential and proprietary information on secure, access-controlled platforms, which require unique user credentials.  Access to Gold Standard's quality management system is password-protected and limited to authorized personnel.

29.    Gold Standard's employees, including Mueller, are required to abide by the confidentiality and trade secret provisions of the Gold Standard Diagnostics Corp Handbook for California Employees (the "Employee Handbook").  The Employee Handbook's Protection of Confidential or Proprietary Information provision states that the Company's confidential and proprietary information is vital to its operations and success.  The provision requires each employee to use all reasonable care to protect or otherwise prevent the unauthorized disclosure of such

6

VERIFIED COMPLAINT

information.  Confidential information must not be disclosed or revealed within or outside the Company without proper authorization or purpose.  The Employee Handbook defines confidential or proprietary information to include information regarding the Company's business methods, business plans, databases, systems, technology, intellectual property, know-how, management, business development, operations, products, services, research, development, inventions, financial statements, financial projections, financing methods, pricing strategies, sources, employee records, system designs, terms and conditions of any business arrangements, methods of competing, and other proprietary information.  Confidential information also includes information about the Company's employees, customers, suppliers, and vendors, as well as financial records, personnel and payroll records, information regarding customer transactions, customer account information, and any documents or information regarding Company operations, procedures, or practices.  The duty not to use or disclose confidential information remains in effect during and after employment.  The Company reserves the right to pursue all legal or equitable remedies to prevent impermissible use of confidential information or to recover damages because of such impermissible use.

30.    The Employee Handbook further provides that upon separation from the Company, employees are prohibited from copying, transmitting, or preserving Company information for their use.  The Company may take all lawful actions it considers appropriate to recover or protect Company property.  All records and files maintained by the Company are confidential and remain the property of the Company.

31.    The Employee Handbook also requires the undivided loyalty of employees. Employees must avoid any investment or other interest in another business that could conflict with the proper performance of their duties or interfere with their independence of judgment.  The Employee Handbook specifically prohibits employees from serving as an officer, director, employee, or consultant of, or receiving income from, any enterprise doing business with or competing with the Company.  The Employee Handbook further provides that employees must not communicate non-public information to a third party unless specifically authorized to do so by the Company or where permitted by law.

32.    The Employee Handbook further requires employees to conduct themselves

7

VERIFIED COMPLAINT

according to rules based on honesty, integrity, respect, fairness, and safety—and consistent with the Code of Ethics.

33.    The Code of Ethics provides, among other things, that employees must never keep or use non-public information except as specifically protected by a confidentiality agreement, provided or legally obtained with the intention that it be used, or constituting proprietary information the employee needs to know or use.  Employees must avoid forwarding or disclosing confidential information unless duly authorized to do so.

34.    The Code of Ethics further provides that employees must avoid conflicts between their personal interests and the interests of the Company.  Employees must be free of any interest that could adversely influence their judgment, objectivity, or loyalty.  The Code of Ethics also provides that appropriation of company property for anything other than official company business is strictly prohibited.  Employees must seek to protect company property—whether tangible or intangible—from loss, damage, misuse, theft, fraud, embezzlement, or destruction.

### Defendant Gerrit Mueller

35.    Gerrit Mueller began his career at Gold Standard as an intern in 2010.  He progressed through a series of positions with increasing responsibility and eventually became the Director of Project Management.  Gold Standard sponsored Mueller's work visa during his employment.

36.    Mueller's most recent title was Director of Project Management within Gold Standard's R&D division.  He held strategic responsibility for the conception, research, development, and commercialization of new diagnostics technologies and products throughout the product life cycle.  He also gathered and prioritized customer requirements, defined product vision, assessed market size, prepared business plans and sales forecasts, managed supply chains and manufacturing processes, and ensured regulatory compliance.  Mueller served as Gold Standard's FDA point of contact for 510(k) submissions.  In his role for Gold Standard, Mueller was also the primary IT resource for the company with unique access to information about Gold Standard's information technology architecture and systems.

37.    As Director of Project Management, Mueller contributed to Gold Standard's R&D projects in varying degrees—working on some directly as the assigned Project Manager and

VERIFIED COMPLAINT

providing guidance and support on others.

38.    Mueller signed the Employee Handbook Acknowledgment, confirming he had read and agreed to follow all Employee Handbook provisions—including the confidentiality, trade secret, and conflict-of-interest provisions described above.

39.    In addition, Mueller completed training on, and was required to abide by, the company's Code of Ethics.

40.    On January 16, 2026, Mueller provided his notice of resignation effective January 30, 2026.

41.    On January 28, 2026, Mueller sat for an exit interview where he discussed transition plans for handing off his responsibilities to other Gold Standard personnel.  At no point prior to leaving did Mueller disclose that he planned to form a competing company, divert Gold Standard's relationship with Bordier, or use Gold Standard's trade secret, confidential, and proprietary information for his own benefit.

**Gold Standard's Trade Secret Information and Mueller's Access to That Information**

42.    Gold Standard's trade secret information includes, but is not limited to: (a) customer lists and customer contact information, customer preferences and projects, and customer pricing data; (b) supplier relationships, terms, and pricing agreements; (c) Gold Standard's Quality Manual and quality system procedures governing product design and development, verification and validation testing, complaint handling, and other regulated processes; (d) standard operating procedures, for product development and other core business functions; (e) product development deliverables checklists and design controls; (f) assembly instructions, kit instruction sheets, instructions for use, kit labels, and other product documentation; (g) scientific and technical data, formulas, and prototypes; (h) product development information, including R&D strategies and regulatory strategies; (i) FDA and IVDR filing data and information; (j) testing data at customer sites; (k) cost and pricing information; (l) marketing strategies and promotional techniques; (m) business plans and sales forecasts; (n) pending projects and proposals; and (o) information about projects and products planned for launch.

43.    Mueller had access to each and every one of the aforementioned categories of Gold

VERIFIED COMPLAINT

Standard's trade secret information.

44.     This information derives independent economic value, both actual and potential, from not being generally known to other persons, businesses, or the public, who could obtain economic value from its disclosure or use.  Competitors and intermediaries, such as Clear Path and those working for or on behalf of competitors, can profit from the use and disclosure of this trade secret information.

45.     Gold Standard made reasonable efforts to protect its proprietary, confidential, and trade secret information, and to keep it secret and non-public.  These efforts include password-protected and access-controlled information systems, keycard-controlled facility access, the Employee Handbook's confidentiality and conflict-of-interest provisions, the Code of Ethics, employee training on confidentiality and trade secret obligations, and limiting access to sensitive information to employees with a business need to know.

46.     Gold Standard's business is international and its trade secret information is related to products and services used in or intended for use in global commerce, namely medical diagnostic testing kits and equipment.

### The Bordier Relationship

47.     Bordier is a Swiss biotech company that develops and produces laboratory reagents and kits for the diagnosis of parasitic and mycologic infections.

48.     Gold Standard's partnership with Bordier began in 2013.  Gold Standard was Bordier's exclusive reseller of parasitology and mycology diagnostic kits in the United States and Canada.

49.     Over the 13-year relationship, Gold Standard grew the U.S. market for Bordier products by over 600%.

50.     The Bordier kits represented a significant percentage of Gold Standard's annual sales.

### Pre-Departure Planning and Misappropriation

51.     Upon information and belief, Mueller has retained Gold Standard's proprietary, confidential, and trade secret information on a device that is still in his possession today.

52.     In the months leading up to his departure, Mueller's access to Greenlight Guru, the

10

VERIFIED COMPLAINT

platform that hosts Gold Standard's QMS, increased dramatically.

53.     Late in the evening of January 29, 2026, the eve of his last day of employment, Mueller conducted a final intensive session of QMS document access.  He accessed 47 documents between 10 and 11 p.m., documents he would have no reason to access for any project or product he was working on at that time.  The evidence strongly suggests that Mueller downloaded documents to a drive he maintained and, upon information and belief, still maintains and is using on behalf of Clear Path, a Gold Standard competitor.

54.     The documents Mueller accessed include Gold Standard's quality manual (the base document for the QMS), quality system procedures ("QSPs") governing regulated processes such as design and development, verification and validation, and complaint handling; standard operating procedures ("SOPs") for product development; product development information; instructions for diagnostic test kits and instructions for use ("IFUs"); and kit labels.  These documents are the backbone of Gold Standard's FDA-regulated business and cost millions of dollars and took years to develop.

55.     In addition, Mueller began accessing Gold Standard's proprietary, confidential and trade secret customer information on Zoho, Gold Standard's CRM system in the months and days leading up to his departure.  Starting in October 2025, Mueller searched for and accessed Gold Standard customer information, including information for customers of Bordier products.

56.     Mueller had no business reason to access the customer information from Zoho and there is no record of him accessing Zoho at any point prior to October 2025.

**Formation of Clear Path and Competition with Gold Standard**

57.     Upon his resignation, Mueller told Gold Standard he was leaving the diagnostic industry.

58.     Gold Standard has now discovered that was a lie and that he unlawfully and unfairly formed a competing company.

59.     On February 12, 2026—just 13 days after Mueller left Gold Standard—Mueller and his wife filed Articles of Organization for Clear Path Diagnostics LLC with the California Secretary of State.

11
VERIFIED COMPLAINT

60. On February 13, 2026, the domain for Clear Path (cpdiag.com) was registered.

61. By March 16, 2026, Clear Path had an active FDA establishment registration as an initial distributor/importer, with Gerrit Mueller listed as the official correspondent.

62. Clear Path directly competes with Gold Standard. Its website describes Clear Path's mission as leading "the U.S. market in niche IVD solutions by delivering innovative, dependable, and user-friendly diagnostic products that ensure laboratories achieve better patient outcomes." The homepage advertises "Trusted Diagnostic Solutions for Parasitology and Mycology."

63. Clear Path's product catalog lists the same Bordier products that Gold Standard previously distributed in the United States.

64. The rapid formation of Clear Path within weeks of Mueller's departure demonstrates that Mueller used Gold Standard's proprietary information to unlawfully and unfairly compete with Gold Standard.

65. Establishing a medical device company that is authorized to do business in the United States is typically not something that can be accomplished in a matter of days or weeks. Medical device companies operate in a highly regulated environment. Among other requirements, a quality management system is essential for purposes of running the business and complying with numerous regulations by various regulatory bodies, including but not limited to the FDA.

66. Gold Standard invested millions of dollars and many years to build its regulatory and quality infrastructure. Gold Standard's QMS protects patients, satisfies regulators, reduces risk, and ensures devices are safe, effective, compliant and consistently manufactured and handled.

67. In contrast to the months' (or even years') long process to establish a going concern medical device company, Mueller seemingly launched Clear Path overnight, in a way that cannot be explained other than that he was working on the establishment of a competing business for months prior to his departure from Gold Standard.

68. Forensic evidence strongly suggests that Mueller retained Gold Standard's confidential, proprietary, and trade secret information on a device that is, upon information and belief, still in his possession to this day.

69. In addition, records from Greenlight Guru show that Mueller accessed documents

12
VERIFIED COMPLAINT

from Gold Standard's quality system on his last weeks and days at the company.

70. Mueller also accessed Gold Standard's customer information from its CRM platform, including information for customers of Bordier products, in his final weeks and days at the company.

71. Upon information and belief, Mueller's wife, Iva Mueller, and Clear Path have misappropriated and continue to misappropriate Gold Standard's trade secrets, interfere with Gold Standard's customer relationships and otherwise unfairly compete with Gold Standard.

72. All signs point to Defendants unlawfully and unfairly creating a competing medical diagnostics company at an accelerated pace using Gold Standard's proprietary, confidential, and trade secret information.

### Evidence of Customer Solicitation

73. Upon information and belief, Clear Path has already begun soliciting other suppliers and customers of Gold Standard.

74. Indeed, some of Gold Standard's customers have reached out to Gold Standard to advise that they have been approached by Clear Path.

### First Cause of Action

### Misappropriation of Trade Secrets (18 U.S.C. § 1832, *et seq.*)

### (Against All Defendants)

75. Gold Standard realleges and incorporates by reference each allegation above.

76. Gold Standard's proprietary and confidential information—including its customer lists and contact information, supplier relationships and pricing, quality system procedures, product development information, regulatory strategies, cost and pricing data, and other information described in this Complaint—constitutes trade secret information as defined by the DTSA, 18 U.S.C. § 1832, *et seq.*

77. This information derives independent economic value, both actual and potential, from not being generally known to other persons, businesses, or the public, who could obtain economic value from its disclosure or use.

78. Gold Standard made reasonable efforts to protect its proprietary, confidential, and trade secret information, and to keep it secret and non-public.

13

VERIFIED COMPLAINT

79. Gold Standard's trade secret information is related to products and services used in or intended for use in interstate commerce, namely medical diagnostic testing kits and equipment. Gold Standard sells its medical diagnostic testing kits and equipment to customers located in numerous states around the country.

80. Defendants improperly misappropriated, and threaten to further misappropriate, Gold Standard's trade secret information as described in this Complaint by accessing, acquiring, using, or disclosing Gold Standard's proprietary, confidential, and trade secret information to unauthorized individuals and entities without Gold Standard's authorization.

81. Defendants knew or had reason to know under the circumstances that the misappropriated information was Gold Standard's trade secret information that was accessed, acquired, used, or disclosed by improper and unauthorized means.

82. Mueller misappropriated Gold Standard's proprietary, confidential, and trade secret information by, upon information and belief, accessing and downloading massive quantities of Gold Standard's QMS documents at sharply elevated and unexplained rates starting in October 2025—including on his final day—and using that information to establish and operate Clear Path as a competing diagnostics distribution company.  Upon information and belief, Clear Path and Iva Mueller received, used, and benefited from Gold Standard's misappropriated trade secret information.

83. Upon information and belief, Defendants continue to use and disclose to third parties, and threaten to continue to use and disclose to third parties, Gold Standard's trade secret information without Gold Standard's consent or permission, in an effort to benefit themselves.

84. Upon information and belief, Defendants have taken, used, and disclosed, and threaten to continue to take, use, and disclose, Gold Standard's proprietary, confidential, and trade secret information maliciously and in willful and conscious disregard of the rights of Gold Standard.

85. Gold Standard has suffered and will continue to suffer irreparable injury, in addition to monetary damages, as a direct and proximate result of Defendants' conduct, in an amount to be proven at trial.

86. Unless enjoined by this Court Defendants will continue their unlawful actions and

14
VERIFIED COMPLAINT

Gold Standard will continue to be irreparably harmed.

**Second Cause of Action**

**Misappropriation of Trade Secrets**

**(Cal. Civ. Code, § 3426, *et seq.*)**

**(Against All Defendants)**

87. Gold Standard realleges and incorporates by reference each allegation above.

88. Gold Standard's proprietary and confidential information described in this Complaint constitutes trade secret information as defined by California's Uniform Trade Secrets Act ("CUTSA"), codified in California Civil Code § 3426, *et seq.*

89. This information derives independent economic value, both actual and potential, from not being generally known to other persons, businesses, or the public, who could obtain economic value from its disclosure or use.

90. Gold Standard made reasonable efforts to protect its proprietary, confidential, and trade secret information, and to keep it secret and non-public.

91. Defendants improperly misappropriated, and threaten to further misappropriate, Gold Standard's trade secret information as described in this Complaint by accessing, acquiring, using, or disclosing Gold Standard's proprietary, confidential, and trade secret information to unauthorized individuals and entities without Gold Standard's authorization.

92. Defendants knew or had reason to know under the circumstances that the misappropriated information was Gold Standard's trade secret information that was accessed, acquired, used, or disclosed by improper and unauthorized means.

93. Mueller misappropriated Gold Standard's proprietary, confidential, and trade secret information by, upon information and belief, accessing and downloading Gold Standard's QMS documents and using that information to establish and operate Clear Path as a competing diagnostics distribution company. Upon information and belief, Clear Path and Iva Mueller, upon information and belief, received, used, and benefited from Gold Standard's misappropriated trade secret information.

94. Upon information and belief, Defendants continue to use and disclose to third parties,

15

VERIFIED COMPLAINT

and threaten to continue to use and disclose to third parties, Gold Standard's trade secret information without Gold Standard's consent or permission, in an effort to benefit themselves.

95. Upon information and belief, Defendants have taken, used, and disclosed, and threaten to continue to take, use, and disclose, Gold Standard's proprietary, confidential, and trade secret information maliciously and in willful and conscious disregard of the rights of Gold Standard.

96. Gold Standard has suffered and will continue to suffer irreparable injury, in addition to monetary damages, as a direct and proximate result of Defendants' conduct, in an amount to be proven at trial.

97. Unless enjoined by this Court, Defendants will continue their unlawful actions and Gold Standard will continue to be irreparably harmed. Under California Civil Code § 3426.2, Gold Standard is entitled to an injunction against Defendants' misappropriation and continued threatened misappropriation of its proprietary, confidential, and trade secret information as alleged in this Complaint.

98. Defendants' acts in wrongfully misappropriating Gold Standard's proprietary, confidential, and trade secret information were, and continue to be, willful and malicious—warranting exemplary damages under California Civil Code § 3426.3(c) and reasonable attorneys' fees under California Civil Code § 3426.4.

**Third Cause of Action**

**Intentional Interference with Contractual Relations**

**(Against All Defendants)**

99. Gold Standard realleges and incorporates by reference each allegation above.

100. Gold Standard had a valid and existing contractual relationship with Bordier as Bordier's exclusive U.S. reseller of parasitology and mycology diagnostic kits—a relationship that began in 2013 and generated significant benefits for Gold Standard.

101. Gold Standard also has valid and existing contractual relationships with the customers to whom Gold Standard sells its medical diagnostic kits and equipment.

102. Mueller knew of the existence of Gold Standard's contractual relationships, including the relationship with Bordier, as Mueller managed the Bordier account for about 10 years and had

16

VERIFIED COMPLAINT

the primary relationship with Bordier.

103.    Upon information and belief, Mueller's conduct in forming Clear Path and soliciting Bordier and Gold Standard's customers to terminate their relationships with Gold Standard prevented or interfered with Bordier's continued performance of its supply obligations to Gold Standard and Gold Standard's customers' obligations to purchase from Gold Standard.

104.    Upon information and belief, in so acting, Mueller intended to disrupt or interfere with Bordier's relationship with Gold Standard and Gold Standard's customers' relationships with Gold Standard or knew that such disruption or interference was certain or substantially certain to occur.

105.    Mueller engaged in independently wrongful conduct by interfering with Gold Standard's contractual relationships with Bordier and its customers, including by misappropriating Gold Standard's trade secrets and using his position of trust to divert Gold Standard's key supplier to his own competing company.

106.    Upon information and belief, Defendants Iva Mueller and Clear Path have directly participated in the interference with Gold Standard's contractual relationships with Bordier and Gold Standard's customers as described above.

107.    Defendants' disruption and interference with Gold Standard's contractual relationships with Bordier and its customers have caused harm to Gold Standard in an amount that cannot currently be calculated and that, if it becomes calculable at a future date, will be proven at trial.

108.    Defendants' conduct was not only knowing, but malicious, fraudulent, and oppressive and entitles Gold Standard to an award of punitive or exemplary damages.

**Fourth Cause of Action**

**Breach of the Duty of Loyalty**

**(Against Defendant Gerrit Mueller)**

109.    Gold Standard realleges and incorporates by reference each allegation above.

110.    At all relevant times during Mueller's employment with Gold Standard, he owed Gold Standard a duty of loyalty.

17

VERIFIED COMPLAINT

111.    All employees in California owe their employers a general duty of loyalty "to refrain from competing with [their employer] and from taking action on behalf of or otherwise assisting [their employer's] competitors." *Huong Que, Inc. v. Luu*, 150 Cal.App.4th 400, 416 (2007).

112.    Mueller had a duty of loyalty to act in the best interests of Gold Standard.

113.    Upon information and belief, Mueller breached his duty of loyalty owed to Gold Standard during his employment by, among other things: (a) planning and preparing to form a competing business while still employed at Gold Standard; (b) accessing and downloading massive quantities of Gold Standard's proprietary QMS documents outside normal business hours and without any legitimate business justification; (c) misappropriating Gold Standard's proprietary, confidential, and trade secret information—including customer lists, quality system documents, and supplier relationship information—and using that information to establish and operate Clear Path; (d) upon information and belief, communicating with Bordier about a new supply arrangement while still employed at Gold Standard or shortly thereafter; and (e) misrepresenting his intentions upon departing Gold Standard.

114.    Mueller's breaches of his duty of loyalty have caused harm to Gold Standard in an amount that cannot currently be calculated and that, if they become calculable at a future date, will be proven at trial.

115.    Mueller's conduct was not only knowing, but malicious, fraudulent, and oppressive and entitles Gold Standard to an award of punitive or exemplary damages.

### Fifth Cause of Action

### Aiding and Abetting Breaches of the Duty of Loyalty

### (Against Defendants Clear Path and Iva Mueller)

116.    Gold Standard realleges and incorporates by reference each allegation above.

117.    Upon information and belief, Clear Path and Iva Mueller knew that Mueller had a duty of loyalty to act in Gold Standard's best interests and to refrain from competing with Gold Standard, or subverting Gold Standard's interests, during the period of time in which he was still employed at Gold Standard.

118.    Upon information and belief, Clear Path and Iva Mueller intended to and did aid and

18

VERIFIED COMPLAINT

abet Mueller in breaching his duty of loyalty to Gold Standard. They encouraged, instructed, or provided substantial assistance to him in misappropriating Gold Standard's trade secret information while he was still employed with Gold Standard, and in co-forming and co-operating Clear Path using Gold Standard's misappropriated proprietary information. Iva Mueller co-signed the Articles of Organization for Clear Path on February 12, 2026, and is, upon information and belief, involved in Clear Path's operations. Gold Standard believes that Clear Path and Iva Mueller knew Mueller's actions in misappropriating Gold Standard's proprietary, confidential, and trade secret information breached his duty of loyalty to Gold Standard.

119. Clear Path's and Iva Mueller's substantial encouragement or assistance to Mueller in these regards have caused harm to Gold Standard in an amount that cannot currently be calculated and that, if they become calculable at a future date, will be proven at trial.

120. Clear Path's and Iva Mueller's conduct was malicious, fraudulent, and oppressive and entitles Gold Standard to an award of punitive or exemplary damages.

### Sixth Cause of Action

### Conversion

### (Against All Defendants)

121. Gold Standard realleges and incorporates by reference each allegation above.

122. Gold Standard owned the proprietary, confidential, and trade secret information misappropriated by Defendants and referenced in this Complaint at all relevant times.

123. Defendants substantially interfered, and continue to substantially interfere, with Gold Standard's proprietary, confidential, and trade secret information/property by knowingly, intentionally, and wrongfully misappropriating, disseminating, and using it for their benefit and to Gold Standard's detriment.

124. At no point did Gold Standard consent to Defendants' interference with Gold Standard's proprietary, confidential, and trade secret information, as described above.

125. As a direct and proximate result of Defendants' knowing, intentional, and wrongful misappropriation, dissemination, and use of Gold Standard's proprietary, confidential, and trade secret information for their benefit and to Gold Standard's detriment, Gold Standard has suffered

19

VERIFIED COMPLAINT

harm in an amount that cannot currently be calculated and that, if it becomes calculable at a future date, will be proven at trial.

126. Defendants' conduct described in this Complaint was a substantial factor in causing Gold Standard's harm.

127. Defendants' conduct was malicious, fraudulent, and oppressive and entitles Gold Standard to an award of punitive or exemplary damages.

**Seventh Cause of Action**

**Violation of Unfair Competition Law (Cal. Bus. & Prof. Code, § 17200, *et seq.*)**

**(Against All Defendants)**

128. Gold Standard realleges and incorporates by reference each allegation above.

129. California Business and Professions Code § 17200 ("Section 17200") prohibits any "unlawful," "unfair," or "fraudulent" business practice.

130. Defendants violated Section 17200's prohibition against engaging in an unlawful, unfair or fraudulent business practice by, among other things, misappropriating Gold Standard's proprietary, confidential, and trade secret information.

131. Mueller violated Section 17200 by misappropriating Gold Standard's proprietary, confidential, and trade secret information while still employed at Gold Standard, and using that information to form and operate Clear Path as a competing diagnostics distribution business. He also breached his duty of loyalty to Gold Standard, intentionally interfered with Gold Standard's business relationship with Bordier, and diverted Gold Standard's supplier and customers to Clear Path.

132. Clear Path and Iva Mueller have also violated Section 17200 by aiding and abetting Mueller's breach of his duty of loyalty to Gold Standard, and receiving and using Gold Standard's misappropriated trade secret information.

133. Defendants' conduct caused, continues to cause, and threatens to cause substantial injury to Gold Standard.

134. Gold Standard has suffered injury in fact and suffered harm because of Defendants' unlawful conduct.

VERIFIED COMPLAINT

135.    Under California Business and Professions Code § 17203, Gold Standard seeks an order requiring Defendants to immediately cease all unlawful, unfair, and fraudulent business practices and to disgorge and return to Gold Standard the full amount of money they received from those practices, to the extent such an amount becomes calculable.

**Prayer for Relief**

Gold Standard requests that judgment be entered in its favor against Defendants as follows:

1.    That Defendants be adjudged to have misappropriated Gold Standard's proprietary, confidential, and trade secret information in violation of the DTSA, 18 U.S.C. § 1832, *et seq.*, and that the acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

2.    That Defendants be adjudged to have misappropriated Gold Standard's proprietary, confidential, and trade secret information in violation of the CUTSA, Cal. Civ. Code § 3426, *et seq.*, and that the acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

3.    That Mueller be adjudged to have interfered with or disrupted Gold Standard's contractual relationships, including with Bordier, and that his acts in interfering with or disrupting that relationship be adjudged willful, malicious, oppressive, and done knowingly;

4.    That Mueller be adjudged to have breached his duty of loyalty to Gold Standard, and that his acts in doing so be adjudged willful, malicious, oppressive, and done knowingly;

5.    That Clear Path and Iva Mueller be adjudged to have aided and abetted Mueller's breaches of his duty of loyalty to Gold Standard, and that their acts in doing so be adjudged willful, oppressive, and done knowingly;

6.    That Defendants be adjudged liable for conversion of Gold Standard's proprietary, confidential, and trade secret information, and that Defendants' acts in doing so be adjudged fraudulent, willful, malicious, oppressive, and done knowingly;

7.    That Defendants be adjudged liable for violating Section 17200's prohibition against

21

engaging in unlawful, unfair, or fraudulent business practices, and that they each be required to return to Gold Standard the full amount of money they have received because of such business practices;

8. Granting a preliminary and permanent injunction that will: (1) enjoin Clear Path from engaging in business operations on account of its wholesale theft of Gold Standard's trade secrets; (2) enjoin Defendants from divulging, using, disclosing, or making available Gold Standard's trade secrets to any third party, or using any trade secrets to compete directly or indirectly with Gold Standard; (3) require Defendants to preserve electronic evidence by prohibiting them from destroying, altering, accessing, deleting, or hiding from discovery any electronic storage media containing Gold Standard's information, except for forensic investigation purposes; (4) require Defendants to turn over any property or information—including documents and electronic files—wrongfully removed, obtained, or withheld from Gold Standard for forensic inspection; (5) require Defendants to submit all electronic storage media Mueller used or accessed—including personal computers, devices, and accounts—for a full forensic inspection to allow Gold Standard to recover its misappropriated trade secrets and determine to whom Defendants disclosed or disseminated that information; and (6) enjoin Mueller from violating his legal and contractual duties to Gold Standard;

9. Awarding damages in favor of Gold Standard and against Defendants in amounts that are not currently able to be calculated and are to be proven at trial, including (to the extent they become calculable in the future) lost profits, other compensatory damages, consequential damages, disgorgement of compensation Gold Standard paid Mueller during his period of disloyalty, and disgorgement of Defendants' ill-gotten gains and unjust enrichment;

10. Awarding punitive and/or exemplary damages against Defendants in an amount to be determined at trial;

11. Awarding Gold Standard pre-judgment and post-judgment interest, attorneys' fees

VERIFIED COMPLAINT

and costs, and other expenses incurred in this action; and

12.     Granting Gold Standard such other relief as this Court deems just and proper.

### Demand for Jury Trial

Gold Standard demands a trial by jury under Federal Rule of Civil Procedure 38.

Dated:  April 7, 2026                    **DUANE MORRIS LLP**


By: */s/ Michelle N. Khoury*
    Courtney L. Baird
    Michelle N. Khoury
    Ryan S. Crawford

    Lawrence H. Pockers (*pro hac vice* forthcoming)

    Attorneys for Plaintiff
    GOLD STANDARD DIAGNOSTICS, LLC

23
VERIFIED COMPLAINT

## **Verification**

I, John Griffiths, am President of Plaintiff Gold Standard Diagnostics, LLC, ("Gold Standard") and am authorized to act and submit this Verified Complaint on Gold Standard's behalf.

I am authorized to make this Verification on Gold Standard's behalf. I have read this Verified Complaint and know its contents. The statements are true of my own knowledge, or I have gained such knowledge from a review of Gold Standard's books and records maintained in the ordinary course of business, which I believe to be true and accurate. As to matters stated upon information and belief, I believe them to be true.

I declare under penalty of perjury under the laws of the United States that this statement is true and correct.

Executed this 7th day of April, 2026.

John Griffiths