UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GOLD STANDARD DIAGNOSTICS, LLC,

Plaintiff,

v.

CLEAR PATH DIAGNOSTICS LLC et al.,

Defendants.

No.  2:26-cv-01403-DAD-CSK

ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

(Doc. No. 5)

This matter is before the court on plaintiff's motion for a temporary restraining order. (Doc. No. 5.)  The motion was taken under submission at the conclusion of the April 16, 2026 hearing, at which counsel for the parties appeared and argued.  (Doc. No. 24.)  For the reasons explained below, plaintiff's motion will be denied.

**BACKGROUND**

On April 7, 2026, plaintiff filed a complaint initiating this action.  (Doc. No. 1.)  Therein, plaintiff asserts the following causes of action:  (1) Misappropriation of trade secrets in violation of 18 U.S.C. § 1832 *et seq.*, the Defend Trade Secrets Act ("DTSA"); (2) Misappropriation of trade secrets in violation of California Civil Code § 3426 *et seq.*, the California Uniform Trade Secrets Act ("CUTSA"); (3) Intentional interference with contractual relations; (4) Breach of the

/////

1

duty of loyalty against defendant Gerrit Mueller ("defendant Gerrit");[1] (5) Aiding and abetting the breach of the duty of loyalty against defendants Clear Path Diagnostics LLC ("Clear Path") and Iva Mueller ("defendant Iva"); (6) Conversion; and (7) Violation of California Business and Professions Code §§ 17200 *et seq.*, the California Unfair Competition Law.  (*Id.* at ¶¶ 75–135.)  On April 8, 2026, plaintiff filed the pending motion for temporary restraining order.  (Doc. No. 5.)  On April 14, 2026, defendants filed an opposition.  (Doc. No. 19.)  On April 16, 2026, plaintiff filed a reply thereto.  (Doc. No. 23.)

Plaintiff alleges[2] as follows.  Plaintiff sells medical diagnostic equipment and testing kits.  (Doc. No. 1 at ¶ 2.)  As a player in this market, plaintiff must maintain strict compliance with various regulations and standards promulgated by the "Federal and Drug Administration"[3], the European Union's In Vitro Diagnostic Regulation, International Standards Organization, and the Medical Device Single Audit Program.  (*Id.* at ¶ 3.)  To ensure that it maintains compliance with those regulations and standards, plaintiff has spent "millions of dollars" to develop a Quality Management System ("QMS"), which plaintiff defines as "a formalized framework of policies, processes, procedures, and responsibilities that governs every aspect of Gold Standard's operations including product design and development, verification and validation testing, complaint handling and manufacturing controls and documentation."  (*Id.* at ¶ 4; Doc. No. 5-2 at ¶ 5.)  Plaintiff also maintains confidential client information on Zoho, a third-party platform.  (Doc. No. 1 at ¶ 55; Doc. No. 5-2 at ¶ 10.)  Plaintiff "goes to extraordinary lengths" to maintain the secrecy of this information by restricting access to limited personnel with unique user credentials, maintaining all information on password-protected computers and encrypted

/////

---

[1]  Because Gerrit Mueller and his wife Iva Mueller are named defendants in this action, the court refers to them by first name in this order only for the sake of clarity.

[2]  In this regard, the court refers to both the factual allegations of plaintiff's complaint as well as the declarations submitted by plaintiff in support of the pending motion, including those of its Vice-President for Research and Development, Frank Lagattuta.

[3]  The court construes this allegation as referring to the "Food and Drug Administration."

networks, and securing its facilities with keycard-controlled access security measures.  (Doc. No. 1 at ¶ 5.)

Defendant Gerrit was plaintiff's employee for more than 15 years, starting as an intern, serving as plaintiff's primary IT resource for approximately nine years, and ending his tenure with plaintiff as director of project management on January 30, 2026.  (*Id.* at ¶¶ 7, 9.)  In his final role, defendant Gerrit had access to the QMS, proprietary product development information, formulations, regulatory strategies, customer and pricing data, and quality system documents.  (*Id.* at ¶ 8.)  Defendant Gerrit signed a form acknowledging that he had read and agreed to the employee handbook which detailed the provisions with which employees must abide both during and after employment, including, but not limited to, refraining from using or disclosing confidential information during their employment, and refraining from "copying, transmitting, or preserving" plaintiff's information for their own personal use upon separation from the company.  (*Id.* at ¶¶ 6, 29–30, 38.)  In the months leading up to his final day of employment, defendant Gerrit took various actions that cannot be explained by his job duties.  (*Id.* at ¶ 16.)

For example, defendant Gerrit accessed Greenlight Guru, a platform that hosts the QMS, at a substantially higher rate than he had previously.  (*Id.* at ¶ 52.)  Between October 23, 2025 and January 30, 2026, defendant Gerrit also accessed Zoho and reviewed client information at an unusual rate.  (Doc. No. 5-2 at ¶ 45; Doc. No. 5-4 at ¶ 11.)  His activity on Zoho was particularly high in the two weeks leading up to his last day of employment with plaintiff.  (Doc. No. 5-2 at ¶ 45.)  Defendant Gerrit saved various files and folders from his laptop onto a USB drive and a file path location labeled "//NASG" ("NASG").  (*Id.* at ¶ 47; Doc. No. 5-4 at ¶¶ 9, 13.)  Some of the files and folders saved onto the USB include the label "Titer" which is associated with files on which plaintiff maintains confidential and proprietary information.  (Doc. No. 5-2 at ¶ 47.)  The NASG is "a separate physical device [that defendant Gerrit] accessed from" the work laptops that plaintiff issued him during his employment and is "not a device or location that is within"

/////

/////

/////

3

plaintiff's network environment, but "is, or was at the time of this activity, in [defendant] Gerrit's possession."[4] (Doc. No. 5-4 at ¶¶ 9, 13.)  Between 10 and 11 p.m. on January 29, 2026, the night before his final day of employment, defendant Gerrit accessed 47 QMS documents including plaintiff's quality manual, quality system procedures, standard operating procedures for product development, other product development information, diagnostic test kits and instructions, and kit labels.  (Doc. Nos. 1 at ¶ 54; 5-2 at ¶ 33, 39.)  Documents that he accessed from the QMS included:  (1) a quality manual which sets forth plaintiff's quality system; (2) standard operating procedures; (3) product development procedures; (4) verification and validation policies; and (5) complaint policies.  (Doc. No. 5-2 at ¶ 50.)  Among the documents that he purportedly accessed and transferred to the NASG on that night was a document containing plaintiff's quality policy that it "uses in the operation of its business."  (*Id.* at ¶¶ 41–43.)[5]  On the last day of his employment, defendant Gerrit erased the browser history on one of his laptops, which he had no reason to do.  (*Id.* at ¶ 48.)  Plaintiff alleges that defendants either currently possess or has used information related to plaintiff's QMS, standard operating procedures, customer information, and other information that plaintiff uses to run its business.  (*Id.* at ¶ 50.)

On February 12, 2026, defendants Gerrit and Iva filed Articles of Organization for Clear Path with the California Secretary of State.  (Doc. Nos. 1 at ¶ 12; 5-2 at 13.)  Shortly thereafter, Clear Path secured active FDA registration as an "initial distributor/importer[.]"  (Doc. No. 1 at ¶ 12.)  Establishing a company that is authorized to sell medical devices in the United States is a process that takes months or years, not days or weeks as defendants have done.  (*Id.* at ¶¶ 65, 67.)  Plaintiff alleges that, because Clear Path has apparently cleared the "significant obstacles" that

---

[4]  The nature of the NASG is presently unclear to the court.  The above characterization comes from the declaration of James Vaughn, a digital forensics expert retained by plaintiff.  However, plaintiff contends that the NASG is a file structure that plaintiff previously maintained, no longer uses, and has served as a vehicle for defendant Gerrit to transfer documents across different networks, including, one over which he has full control.  (Doc. No. 5-2 at ¶ 36.)  Defendant Gerrit states that the NASG is merely his private home server.  (Doc. No. 19-2 at ¶ 14.)

[5]  In its reply brief, plaintiff further states that the quality policy "specifically relates to a formal, top-level statement issued by executive management that defines the organization's commitment to quality, regulatory compliance, and continuous improvement."  (Doc. No. 23-1 at ¶ 17.)

4

medical device companies face in obtaining the necessary approval to sell these products in such a short period of time, the only conclusion that can be reached is that Clear Path has used and continues to use plaintiff's trade secret information.  (Doc. No. 5-2 at ¶ 52.)

In March 2026, one of plaintiff's key suppliers, Bordier Affinity Products SA ("Bordier"), suddenly terminated its business relationship with plaintiff and signed on with Clear Path after Bordier had previously used plaintiff as its exclusive distributor in the United States and Canada for over 10 years.  (*Id.* at ¶ 20–21, 23.)  Plaintiff believes that Clear Path has solicited other suppliers and customers of plaintiff because "[s]ome customers have reached out to Gold Standard to advise that they have been approached by Clear Path."[6]  (*Id.* at ¶ 53.)  However, as acknowledged by plaintiff's Vice President of Research and Development, it was the case starting in October 2025, that plaintiff and Bordier began to have a dispute regarding how to allocate the additional costs that came with the tariffs imposed by the Trump administration.  (*Id.* at ¶ 22.)

### LEGAL STANDARD

The standard governing the issuing of a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  A plaintiff seeking a preliminary injunction must make a showing on all four of these prongs. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

---

[6]  In its motion, plaintiff represents that "at least one" customer has reached out, not that "some customers have reached out."  (Doc. No. 5-1 at 16.)  At the hearing, plaintiff's counsel clarified that plaintiff had lost all customers who were purchasing Bordier products through plaintiff, which counsel estimated had comprised approximately 25% of plaintiff's entire business.

5

1135 (9th Cir. 2011).  The Ninth Circuit has also held that "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *Id.* at 1134–35 (citation omitted).  The party seeking the injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

**DISCUSSION**

**A.      Likelihood of Success on the Merits**

          1.      Trade Secret Claims Under the DTSA and CUTSA

          "California has adopted the Uniform Trade Secrets Act ("UTSA") which codifies the basic principles of common law trade secret protection."  *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) (citing Cal. Civ. Code §§ 3426–3426.10).  Courts analyze DTSA and CUTSA claims together "because the elements are substantially similar."  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020).  "To succeed, the moving party must prove (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff."  *Sharif v. Dawson*, No. 26-cv-00965-LL-JLB, 2026 WL 616493, at *4 (S.D. Cal. Mar. 4, 2026) (internal quotation marks and citation omitted).

          "The definition of a 'trade secret' is extremely similar under the DTSA and CUTSA."  *Genasys Inc. v. Vector Acoustics, LLC*, 638 F. Supp. 3d 1135, 1150 (S.D. Cal. 2022).  "To prove ownership of a trade secret, plaintiffs must identify the trade secrets and carry the burden of showing they exist."  *InteliClear*, 978 F.3d at 658 (internal quotation marks and citation omitted).  "Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial."  *Id.*  "Although a plaintiff need not spell out the details of the trade

6

secret," they must provide "sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade . . . [and] must clearly refer to tangible trade secret material instead of referring to a system which potentially qualifies for trade secret protection." *E. W. Bank v. Shanker*, No. 20-cv-07364-WHO, 2021 WL 3112452, at *8 (N.D. Cal. July 22, 2021) (internal quotation marks and citations omitted).  With respect to misappropriation:

> The DTSA and CUTSA both define "misappropriation" to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  Both statutes also define "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means . . . ."

*Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-cv-01441-LHK, 2018 WL 1990226, at *4 (N.D. Cal. Mar. 15, 2018) (internal citations omitted).

### a.    *Existence of Trade Secrets*

Here, plaintiff contends that the trade secrets at issue are, "documents and information comprising Gold Standard's quality management system and customer information." (Doc. No. 5-1 at 12.)  Plaintiff argues that all of this information is both generally unknown to the public and something that plaintiff derives significant economic value from maintaining its secrecy because plaintiff invested millions of dollars and a significant amount of resources "over many years to develop its quality management system and broader business infrastructure, including the systems required for regulatory compliance." (*Id.* at 12–13.)  Plaintiff also contends that it expended "significant time and resources" and kept its trade secrets "confidential to maintain its competitive advantage." (*Id.* at 12.)

In opposition, defendants contend that there is nothing novel about plaintiff's QMS because it merely documents plaintiff's compliance with FDA regulations (Doc. No. 19 at 8–9), and plaintiff's customer contact information is not a trade secret under either the DTSA (because they are readily ascertainable by proper means, i.e., conducting searches on Google and Microsoft CoPilot), or under the CUTSA (because plaintiff's customers are well known among competitors). (*Id.* at 18–20).  Moreover, defendants argue that there is "a complete absence of

any evidence that Clear Path used or is using any customer list or pricing information to solicit" clients.  (*Id.* at 19–20.)

As noted above, plaintiff characterizes the QMS as a "framework of policies, processes, procedures, and responsibilities that governs every aspect of Gold Standard's operations, including product design and development, verification and validation testing, complaint handling and manufacturing controls and documentation."  (Doc. No. 5-2 at ¶ 5.)  At the hearing on the pending motion, the court inquired about the boundaries of plaintiff's claimed trade secrets.  In the court's view, plaintiff's counsel responded simply by reiterating that those trade secrets consist of the various standard operating procedures, including packaging and storing of products, delivery logistics, managing customer complaints, labeling, and serving, that are implemented in running plaintiff's business.  For purposes of resolving the present motion only, the court finds that these "catch-all" descriptions are too "vague, conclusory, and insufficient to allege a trade secret." *Rescue 1 Fin., LLC v. Complete Debt Relief, LLC*, No. 23-cv-00982-CJC-KES, 2023 WL 6373884, at *3–4 (C.D. Cal. Aug. 24, 2023) (collecting cases), *opinion clarified*, No. 23-cv-00982-CJC-KES, 2024 WL 3081923 (C.D. Cal. Jan. 29, 2024); *see also Five Star Gourmet Foods, Inc. v. Fresh Express, Inc.*, No. 19-cv-05611-PJH, 2020 WL 513287, at *7 (N.D. Cal. Jan. 31, 2020) (concluding that descriptions such as "product composition, packaging and manufacturing logistics are all too vague to adequately allege a trade secret claim.").[7]

However, plaintiff also contends that its customer information is entitled to trade secret protection and has been misappropriated by defendants.  As to its customer information, plaintiff contends that it is maintained through Zoho, a customer relationship management system, and consists of:  (1) plaintiff's customers contact information; (2) the business that plaintiff has historically done and is doing with those customers; (3) pricing information; (4) volumes; (5) profitability analyses; and (6) "a host of other information that is highly confidential and would

---

[7] Because the court concludes that plaintiff has failed to establish the existence of a trade secret and therefore fails on the first *Winter* factor as to the QMS, the court will not consider the other *Winter* factors as to plaintiff's QMS based claim in resolving the motion.  *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) ("Likelihood of success on the merits is 'the most important' factor; if a movant fails to meet this 'threshold inquiry,' we need not consider the other factors.") (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 859 F.3d 848, 856 (9th Cir. 2017)).

8

be of great value to any competitor." (Doc. No. 5-2 at ¶ 10.)  Plaintiff also represents that it maintains customer and supplier contact information, preferences, projects, and pricing data.  (*Id.* at ¶ 11.)  Plaintiff further avers that competitors and other intermediaries, including Clear Path, would profit from the use and disclosure of this customer information (Doc. No. 1 at ¶¶ 44, 47), and that having it would allow competitors to directly solicit plaintiff's customers without having to go through the time-consuming process of identifying them.  (Doc. No. 5-1 at 12.)

The court notes that customer names are generally found not to constitute trade secrets because such information is often publicly available.  *Probo Med., LLC v. Heart Med., LLC*, No. 24-cv-00433-BAS-VET, 2024 WL 3557458, at *4 (S.D. Cal. July 26, 2024).  Nonetheless, customer information can constitute trade secret "if it includes nonpublic information that provides a 'substantial business advantage' to competitors." *Pollara v. Radiant Logistics, Inc.*, 650 F. App'x 372, 373 (9th Cir. 2016)[8] (quoting *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997).  Here, as noted above, plaintiff asserts that its customer information also includes the details of their customers' prior purchases and projects as well as preferences.  This specific customer information falls squarely within the categories that courts have recognized as protectable trade secrets.  *See e.g.*, *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ("Customer information such as sales history and customer needs and preferences constitute trade secrets."); *Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, No. 8:19-cv-00642-JLS-JDE, 2019 WL 2177262, at *6–7 (C.D. Cal. May 20, 2019) (finding that a similar customer database possessed independent economic value).

Plaintiff keeps all of its confidential information, including customer information, on secured platforms that require user credentials to access, and is used by limited personnel.  (Doc. No. 5-2 at ¶ 13.)  Plaintiff's facility is secured through keycard access and its computers and networks are both encrypted and password protected.  (*Id.*).  These reflect reasonable efforts undertaken by plaintiff to preserve the secrecy of this information.  *Chartwell*, No. 8:19-cv-00642-JLS-JDE, 2019 WL 2177262, at *6 (C.D. Cal. May 20, 2019) (finding password-protected

---

[8]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

databases and employment agreements prohibiting disclosure of information reasonable efforts); *Alpha Cap., LLC v. Khanukov*, No. 3:23-cv-1265-JES-DEB, 2023 WL 4721109, at \*4 (S.D. Cal. July 21, 2023) (deeming password protection and limiting access on limited basis reasonable efforts).  Accordingly, the court concludes that plaintiff has made a showing, with respect to its customer information, that it possesses a protectable trade secret.

> b.      *Misappropriation and Resulting Harm*

At this early stage of the litigation, plaintiff is relying upon circumstantial evidence in support of its contention that its trade secret protected customer information has been misappropriated.  "[C]ircumstantial evidence of misappropriation frequently must be balanced against testimony from defendants who directly deny" every allegation of misconduct.  *JBF Interlude 2009 Ltd, v. Quibi Holdings LLC*, No. 2:20-cv-02250-CAS-SK, 2020 WL 9311954, at \*22 (C.D. Cal. Dec. 30, 2020) (internal quotation marks and citation omitted).  Plaintiff has proffered evidence that defendant Gerrit accessed customer information at an unusual frequency in the final months and weeks of his employment.  (Doc. No. 5-2 at ¶ 45.)  Further, at his exit interview on March 28, 2026, defendant Gerrit stated that he was leaving the industry altogether to take an IT position with the State of California.  (*Id.* at ¶ 18.)  Defendant Gerrit argues that his activity on Zoho can reasonably be explained by his job duties.  (Doc. No. 19-2 at ¶ 16.)  Specifically, he contends that, as products manager, he regularly had to access the customer database to resolve customer complaints that were escalated to him by plaintiff's customer support team.  (*Id.*)  However, in its reply brief, plaintiff counters that there are specific instances where defendant Gerrit accessed customer information that simply cannot be explained by his job duties.  (Doc. No. 23-1 at ¶ 8.)  For example, defendant Gerrit accessed information regarding one of plaintiff's clients on January 30, 2026, and plaintiff has confirmed that it has never received any complaints from that customer.  (*Id.* at ¶¶ 10–11.)  Faced with similar facts, another district court concluded that the plaintiffs seeking a preliminary injunction had established trade secret misappropriation pursuant to CUTSA, explaining:

> To begin with, Fontenot refused to disclose to Shippers that he was leaving his employment to join AtMet, a direct competitor, instead

claiming that he had no immediate plans for new employment and that he expected to take some time off after his departure.

Fontenot then spent his final month at Shippers rummaging through Prairie Tools, Shippers' proprietary customer database, to obtain sensitive information regarding Shippers' clients, including contact persons, "ship to" names, "bill to" names, addresses, telephone numbers, and pricing and order history.  Fontenot conducted 494 inquiries in Prairie Tools during his last month, a vast increase from his regular use of the database.  Indeed, Fontenot's searches included 285 pricing queries, more than twice as many as conducted by any other Shippers sales representative during the same time period.  Most suspiciously, the overwhelming majority of Fontenot's searches targeted customers located outside of his sales territory.

Although Fontenot provides a benign explanation for his conduct, the Court finds that Fontenot's account is not credible in light of the contradictory evidence in the record.  First, Fontenot's supervisor, Doug Bank ("Bank"), has testified that he does not believe Fontenot had any legitimate business reason to run so many searches.  Bank opined that it was highly unlikely that a sales representative would use Prairie Tools to verify his commissions in this manner.  Second, Shippers' IT consultant, David Petschulat ("Petschulat"), who designed the Prairie Tools database, filed a declaration with the Court indicating that most of Fontenot's searches would not have yielded information sufficient to allow him to verify his commissions.

\* \* \*

At the hearing on the preliminary injunction, the Court expressed some concern that Shippers has not produced direct evidence that Fontenot or AtMet have actually relied on Shippers confidential information to solicit clients, including the four customers that AtMet allegedly lured away from Shippers before this suit was filed.  Although such direct evidence would have been even more persuasive, the Court nonetheless finds that the circumstantial evidence presented here is sufficient to establish that Shippers is likely to succeed on its misappropriation of trade secrets claim.

*Shippers, a Div. of Ill. Tool Works, Inc. v. Fontenot*, No. 13-cv-01349-JLS-MDD, 2013 WL 12092056, at \*4–5 (S.D. Cal. Sept. 23, 2013) (footnote omitted) (internal citations omitted). The reasoning of the district court in *Fontenot* is equally applicable here and concludes that the circumstantial evidence presented by plaintiff is sufficient to show that it is likely to succeed on its claim that defendant Gerrit misappropriated its customer information.

Finally, with respect to the third element, "[c]ourts generally presume harm when proprietary information is misappropriated." *Implicit Conversions, Inc. v. Stine*, No. 24-cv-03744-WHO, 2024 WL 4112335, at \*10 (N.D. Cal. Sept. 6, 2024) (collecting cases).

11

Accordingly, the court concludes plaintiff is likely to succeed on its trade secret misappropriation claim to the extent that claim is premised on protected customer information related to its customers' prior purchases and projects as well as preferences. Because the court concludes that plaintiff is likely to succeed on the merits of one aspect of its trade secret claims, the court need not address the remaining claims that plaintiff raises under the first *Winter* factor. *All. For Wild Rockies*, 632 F.3d at 1139 (declining to address remaining claims after finding that the plaintiff established that there were serious questions going to the merits of one claim). The court next turns to address whether plaintiff has sufficiently demonstrated it will suffer irreparable harm if a temporary restraining order is not issued as to this aspect of its trade secret claims.

**B.      Irreparable Harm**

To establish irreparable harm, plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (collecting cases). "Those seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013); *see also Luminate Home Loans, Inc. v. Better Mortg. Co.*, No. 24-cv-02251-BAS-MSB, 2025 WL 437903, at *4 (S.D. Cal. Feb. 7, 2025) (applying this approach in the trade secret context). "Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." *Herb Reed Enters.*, 736 F.3d at 1250. However, such a finding must not be "grounded in platitudes rather than evidence[.]" *Id.* Conclusory affidavits that lack "sufficient support in facts" are inadequate to establish irreparable harm. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985).

Plaintiff argues that, without injunctive relief, it will suffer: (1) disclosure or use of trade secrets and confidential information; (2) acceleration of competitiveness against the party who suffered misappropriation; (3) interference with client relationships; and (4) loss of business goodwill. (Doc. No. 5-1 at 20–22.) According to plaintiff, without the granting of a temporary restraining order, other employees will be encouraged to do as defendant Gerrit did without fear of consequences for violating their confidentiality obligations. (*Id.* at 22–23.) In opposition, defendant argues that plaintiffs' claims in this regard are baseless because defendants have

12

forensically preserved ESI, have agreed not to use any records originating from plaintiff,[9] customers are "well-known among numerous competitors, and thus are not entitled to protection as a 'trade secret[,]'" and that any alleged loss of goodwill may adequately be compensated through the award of monetary damages if plaintiffs were to prevail. (Doc. No. 19 at 21–22.)

Certainly, under some circumstances the risk of losing established customers in the future as a result of a defendant's action "can create lasting, irreparable harm." *Byrd v. Barbieri*, No. 2:25-cv-03091-DC-CKD, 2025 WL 3211801, at *4 (E.D. Cal. Nov. 18, 2025) (internal quotation marks and citation omitted). But where "relationships are already 'irreparably damaged,' it is unclear what further harm, if any, will result absent injunctive relief." *Id.* In support of its contention that defendants are soliciting other of its customers, plaintiff offers only the declaration of its Vice President for Research and Development stating in conclusory fashion that "some customers have reached out to Gold Standard to advise that they have been approached by Clear Path." (Doc. No. 5-2 at ¶ 53.) This showing falls short of satisfying plaintiff's burden in this regard. *Garfield Beach CVS LLC v. Mollison Pharmacy*, No. 17-cv-00879-AJB-MDD, 2017 WL 2505124, at *3 (S.D. Cal. June 9, 2017) (concluding that a declaration consisting of hearsay without "something more, like third party, or first-hand evidence corroborating" the statements failed to show that defendants were actively targeting or soliciting customers or that plaintiff lost business). The only other evidence cited by plaintiff is that relating to defendant Gerrit's actions taken in the months leading up to his departure which strongly suggests that he was accessing the customer information for purposes other than the performance of his job. *See JEB Grp., Inc. v. San Jose*, No. 19-cv-04230-CJC-AGR, 2019 WL 8645651, at *3 (C.D. Cal. May 22, 2019)

/////

---

[9] Defendants' counsel contends that upon his entering this case, defendants sought to cooperate with plaintiff by imposing a litigation hold, having forensic experts preserve defendants' electronically stored information ("ESI"), agreeing that none of plaintiff's information would be used by defendants, and offering to have plaintiff's forensic experts wipe plaintiff's information from defendants' ESI, all in an attempt to avoid having the present motion heard. (Doc. Nos. 19 at 5; 19-1 at 2–3.) According to defendants, this proposal was rejected. At the hearing on the present motion, plaintiff's counsel confirmed that, under the circumstances, plaintiff was not amenable to entering an agreement with defendants as proposed and instead believed that only the issuance of a temporary restraining order would adequately address its concerns.

13

(concluding that evidence of past misappropriation is insufficient to show future threat of future harm).

As noted above, when the court inquired at the hearing on the pending motion whether plaintiff had additional evidence of lost customers, plaintiff's counsel responded only that plaintiff had lost approximately 25 percent of its entire customer base because those customers only purchased Bordier products which plaintiff can no longer offer.  This also does not demonstrate irreparable harm for several reasons.  First, the loss of customers who were purchasing Bordier products is an injury that has already incurred and is a quantifiable economic injury that can be remedied through the award of damages should plaintiff prevail in this action. *KWB & Assocs., Inc. v. Marvin*, No. 18-cv-00289-DMG-KK, 2018 WL 5094927, at *7 (C.D. Cal. Apr. 18, 2018) (holding that the harm incurred from lost clients "that has already occurred . . . is precisely the type of harm compensable through money damages."); *BrightView Landscapes, LLC v. Stowell*, No. 17-cv-08317-FMO-GJS, 2017 WL 10511569, at *3 (C.D. Cal. Dec. 11, 2017) (finding no irreparable harm for injuries from customers that both was quantifiable and had already occurred); *see also Sampson v. Murray,* 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").  All that plaintiff has shown at this early stage of the litigation is that it stands to lose its client base that purchases Bordier products.  Moreover, plaintiff has made no showing that Bordier terminated its relationship with plaintiff because of defendants' alleged conduct.  Rather, plaintiff appears to concede that its relationship with Bordier had soured prior to defendant Gerrit's departure.  Finally, if defendants are interrupting plaintiff's existing relationships, plaintiff's claims appear limited to the loss of current customers to defendants, not to other competitors or with respect to potential customers.  *PlanMember Fin'l Corp. v. Young*, No. 23-cv-03119-GW-AFM, 2023 WL 4291481, at *1 (C.D. Cal. Apr. 28, 2023) ("There does not appear to be any suggestion of a fear about the loss of customers to *others* in the industry, or to a loss of *potential* customers (because Defendants are, for instance, badmouthing Plaintiffs,

14

*i.e.*, harming Plaintiffs' goodwill).  As a result, the Court believes it is likely that any harm traceable to any loss of customers to Defendants will be compensable in damages.").

Accordingly, the court concludes that plaintiff has failed to make an adequate showing that, absent the granting of a temporary restraining order, it will suffer irreparable harm.  Because plaintiff has failed to establish irreparable harm as to its trade secret claims based upon misappropriation of its protected customer information, the court need not address the remaining *Winter* factors.  *All. for the Wild Rockies*, 632 F.3d at 1135.

### CONCLUSION

For the reasons explained above,

1.      Plaintiff's motion for temporary restraining order (Doc. No. 5) is DENIED without prejudice to plaintiff's filing of a properly noticed motion for preliminary injunction; and

2.      The parties are directed to meet and confer and, if possible, submit a joint proposed briefing schedule and hearing date with respect to any motion for a preliminary injunction no later than fourteen (14) days after the date of entry of this order.

IT IS SO ORDERED.

Dated:   **April 20, 2026**

_____
DALE A. DROZD
UNITED STATES DISTRICT JUDGE

15